UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS CORPORATION,

     Plaintiff,

                                          Case No. 02-CV-73853-DT

v.

                                       HONORABLE DENISE PAGE HOOD

ULTRA GOLF CARTS, INCORPORATED,

     Defendant.

_____/

**MEMORANDUM OPINION AND ORDER**

I.      **BACKGROUND**

     On February 28, 2003, the Court entered a Stipulated and Agreed to Final Judgment and Permanent Injunction. Plaintiff General Motors Corporation ("GM") and Defendant Ultra Golf Carts, Inc. ("Ultra") entered into a Settlement Agreement in November 2002. Over one year after the entry of the order, on August 3, 2004, Plaintiff filed a Motion to Have Ultra Golf Carts, Inc. and its Officers, Alisha Miller and Chuck Berry, and Counsel Held in Contempt of this Court's Final Judgment and Permanent Injunction. A response was filed to the motion and a hearing held on the matter.

II.     **ANALYSIS**

     A.     **Jurisdiction**

     Neither party addressed the issue of whether the Court has jurisdiction over the motion filed by Plaintiff. The existence of subject matter jurisdiction may be raised at any time, by any party, or even *sua sponte* by the court itself. *Cmty. Health Plan of Ohio v. Mosser,* 347 F.3d 619, 622 (6th Cir.2003). Parties cannot waive the requirement of subject matter jurisdiction." *Riggs v. Island*

*Creek Coal Co.,* 542 F.2d 339, 343 (6th Cir.1976).

The Court notes that the Stipulated and Agreed to Final Judgment and Permanent Injunction does not contain a provision retaining jurisdiction over the settlement agreement or any language incorporating the terms of the settlement agreement into the order. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 381 (1994). Where a court retains jurisdiction, "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." *Kokkonen*, 511 at 381. Where jurisdiction is not retained, "enforcement of the settlement is for state courts, unless there is come independent basis for federal jurisdiction." *Id.* at 383. The court has no authority to enforce a settlement agreement pursuant to the court's "inherent supervisory power" over a case because federal courts are of limited jurisdiction. *Kokkonen*, 511 U.S. at 378. "Enforcement of a settlement agreement, however, whether through award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Kokkonen*, 511 U.S. at 378. The court may have ancillary jurisdiction over matters resulting from a prior order entered by the court if the court "*expressly reserved* jurisdiction to adjudicate claims." *Id.* at 379.

To the extent Plaintiff is seeking enforcement over and/or interpretation of the November 2002 Settlement Agreement entered into by the parties, the Court does not have ancillary jurisdiction over the Agreement because the parties did not expressly incorporate the terms of the Settlement Agreement in the Stipulated and Agreed to Final Judgment and Permanent Injunction.

Plaintiff has not addressed whether the Court has jurisdiction to enforce the Final Judgment and Permanent Injunction where, as here, the order does not expressly retain to the Court continuing jurisdiction to enforce the order. *See, EEOC v. United Association of Journeyman and Apprentices,*

2

438 F.2d 408, 413 (6th Cir. 1971)(The Sixth Circuit noted that in the district court's permanent injunction order it, "[v]ery properly the court expressly reserved jurisdiction to enforce its order"), *see also, Marshall v. American General Life and Accident Ins. Co.,* 174 F.Supp.2d 709, 713 (M.D. Tenn. 2001)(The district court expressly retained jurisdiction in the permanent injunction order relating to the enforcement and interpretation of the settlement agreement and to effectuate the court's order.)

The Stipulated and Agreed to Final Judgment and Permanent Injunction *may* be similar to a consent decree, which is an order usually involving governmental entities settling lawsuits, since the parties in this case agreed to the language in the Final Judgment and Permanent Injunction. "A consent decree is a strange hybrid in the law." *Brown v. Neeb*, 644 F.2d 551, 560 (6th Cir. 1981). The Sixth Circuit has noted that the district court correctly ruled it had jurisdiction to enforce compliance with a 1994 consent decree in *Bylinski v. The City of Allen Park,* 169 F.3d 1001, 1002 (6th Cir. 1999). In the *Bylinski* case, the district court's consent decree and final judgment expressly retained jurisdiction to enforce the terms of the decree. (*See, Bylinski v. The City of Allen Park*, Case No. 87-70092 (E.D. Mich.), February 15, 1994 Consent Decree, § XXIII and May 12, 1994 Final Judgment, ¶ 21) "It is both a voluntary settlement agreement which could be fully effective without judicial intervention and a final judicial order ... plac[ing] the power and prestige of the court behind the compromise struck by the parties." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994). "[A] consent decree is a settlement agreement subject to continued judicial policing." *Id.* "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties to it or by what might have been written had the plaintiff established his factual claim and legal theories in

3

litigation." *Id.*  A consent decree "should be construed to preserve the position for which the parties bargained." *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992).  "The injunctive quality of a consent decree compels the approving court to: 1) retain jurisdiction over the decree during the term of its existence; 2) protect the integrity of the decree with its contempt powers; and 3) modify the decree if 'changed circumstances' subvert its intended purpose." *Vanguards*, 23 F.2d at 1018.[1]

The Court notes that the Injunction expressly ordered and enjoined Ultra from certain acts. (See Judgment and Permanent Injunction, p. 5) The Judgment and Permanent Injunction does not expressly note the term of the Injunction's existence.  The Court notes that ¶ 9 of the Judgment and Permanent Injunction states, "Ultra is ordered to permit GM, and/or auditors of GM, to audit and inspect the books and records of Ultra for a period of six months after entry of this Final Judgment and Permanent Injunction to determine the scope of Ultra's compliance with this Final Judgment and Permanent Injunction."  It could be construed from this language that the term of the Injunction was only six months after entry, although the Court does not so conclude since the parties did not raise this issue.

The term "permanent" in an order does not mean "in perpetuity" since judges often use the word "permanent" to distinguish post-litigation or post-settlement injunction from the preliminary or temporary injunctions sometimes issued before full resolution of the merits.  *See, EEOC v. Local 40, Int'l Association of Bridge, Structural and Ornamental Iron Workers,* 76 F.3d 76, 80 (2d Cir. 1996); *Davis v. School Dis. of the City of Pontiac,* 95 F.Supp.2d 688, 695 (E.D. Mich. 2000)(Noting that consent decrees or court-ordered judicial supervision of local school systems as a result of past

---

[1] Both the *Vanguard*s and *Vogel* cases were issued before the May 16, 1994 *Kokkonen* Supreme Court case was issued.

discrimination was not intended to operate in perpetuity, citing *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237 (1991)).

The Court recognizes that courts have the power to punish parties for contempt of court orders. *See McAlpin v. Lexington 76 Auto Truck Stop, Inc.,* 229 F.3d 491, 504 (6th Cir. 2000). The Court addresses the contempt issue below as it relates to the Court's order, Final Judgment and Permanent Injunction only, not the Settlement Agreement.

### B.     Contempt

#### 1.     Standard

There are two types of contempt:  criminal and civil.  The real distinction between criminal and civil contempt is the nature of the relief sought and the purpose of that relief. *Penfield Co. v. SEC,* 330 U.S. 585 (1947).  A contempt proceeding is civil if the purpose is "remedial" and intended to coerce the person into doing what he is supposed to do. *Shillitani v. U.S.*, 384 U.S. 364 (1966). Civil contempt is to coerce future compliance with the order and to compensate the opposing party for the party's violation of an order. *United States v. Bayshore Associates, Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991).  Remedial or compensatory action are essentially backward looking, seeking to compensate the complainant through payment of money for damages caused by past acts of disobedience. *Garrison v. Cassens Transport Co.,* 334 F.3d 528, 543 (6th Cir. 2003)(quoting *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1344 (3d Cir. 1976)).  Wilfulness is not a necessary element of civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1948); *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir. 1983).  The burden of proof in a civil contempt proceeding is on the party seeking a contempt order but need not be beyond a reasonable doubt. *Int'l Union, United Mine Workers of America, v. Bagwell,* 512 U.S. 821, 827

5

(1994). Civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are coercive sanctions and avoidable through obedience. *Id.* at 827. Civil sanctions may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. *Id.*

If the purpose is to vindicate the court's authority by using "punitive" measures or punishing the wrongdoer, the proceeding is one for criminal contempt. *Garrison,* 334 F.3d at 543. Criminal contempt is a crime and the penalties, including imprisonment and noncompensatory fines, may not be imposed without the protections of the Constitution required in criminal proceedings. *Int'l Union, United Mine Workers of America,* 512 U.S. at 826, 838. The rules governing criminal contempt are found in Fed.R.Crim.P. Rule 42(b). For "serious" criminal contempt proceedings involving imprisonment of more than six months or noncompensatory and excessive fines, these protections include the right to a jury trial. *Id.* at 826-27, 838-39.

The Court considers Plaintiff's motion as one for civil contempt sanctions.

To establish civil contempt, the movant must produce clear and convincing evidence, a more stringent burden of proof than proof by a preponderance of the evidence, that shows a party violated a definite and specific order of the court requiring the party to perform or refrain from performing a particular act or acts with knowledge of the court's order. *Electrical Workers Pension Trust Fund of Local Union No. 58, et al. v. Gary's Electric Service Co.,* 340 F.3d 373, 379 (6th Cir. 2003). Once the movant establishes a *prima facie* case, the burden shifts to the contemnor who may defend by coming forward with evidence showing, in detail, that he or she is presently unable to comply with the court's order. *Id.* The court also considers whether the contemnor took all reasonable steps within his or her power to comply with the court's order. *Id.* A nonparty officer, in his or her corporate capacity, and, who has notice of the injunction order, is subject to a contempt order. *Id.*

6

at 380.

### 2.    Cadillac Crest, Escalade and H2 Marks

The Court finds that Plaintiff has failed to carry its initial burden to show that Defendant has violated a "definite and specific order" as it relates to Plaintiff's claim that Defendant infringed Plaintiff's Cadillac Crest, Escalade and H2 trademarks and trade dress.  Nothing in the Final Judgment and Permanent Injunction Order expressly refers to the marks, "Cadillac Crest" or "Escalade" or "H2."  Plaintiff points to ¶ 2 which states that Defendant is enjoined from using any false designation or false description or representation or trade dress related in any way to "***GM or*** its HUMMER® vehicles or brand."  The term "GM" may be ambiguous in this context.  Although not a part of the evidence submitted by the parties, it is well-known that GM owns, manufactures and sells numerous lines and brands of vehicles.  The parties specifically identified the "HUMMER" brand in the Order.  If the parties contemplated any other GM *brand,* the parties could have easily noted the Cadillac Crest, Escalade or H2 brands or other names in the Order.  An order granting an injunction "shall be specific in terms" and "shall describe in reasonable detail, and not by reference to the complaint or other document," the acts sought to be restrained.  Fed.R.Civ.P. 65(d).  The Plaintiff has not carried its burden that the term "GM" is specific and describes in reasonable detail the subject of the injunction.  Defendant and its officers may not have violated the Final Judgment and Permanent Injunction entered into by the parties in this case regarding the Cadillac Crest, Escalade or H2 marks.

### 4.    HUMMER Marks

The Final Judgment and Permanent Injunction enjoins Defendant from using, displaying and incorporating Plaintiff's trademarks in the HUMMER® and HUMMER GRILL®.  Exhibit F of

Plaintiff's motion depicts the HUMMER® mark and Exhibit E depicts the HUMMER GRILL® mark.  Plaintiff submitted a copy of the golf carts shown on the www.hotcarts.com website which Plaintiff claims violate the Final Judgment and Permanent Injunction, and clearer images are found on pages 17 and 18 of Plaintiff's motion.

Comparing Plaintiff's HUMMER® mark to the pictures of the golf carts submitted by Plaintiff shows that the mark "HUMMER®" does not appear on the pictures of the golf carts submitted by Plaintiff on pages 17 or 18 or Exhibit B of its motion.

The HUMMER GRILL® mark also does not appear on the pictures of the golf carts submitted by Plaintiff.  The registration indicates that "[t]he mark consists of the configuration of the truck's nose, including the grill area and adjacent panels."  (Ex. E, Plaintiff's Br.)  "The items outlined with broken lines are not claimed as a feature of the mark."  (Ex. E, Plaintiff's Br.)  The HUMMER GRILL® mark shows the turn signal and head lights at each end of the nose and the grill with seven vertical slats in between the lights.  The pictures of the alleged infringing golf carts, found on pages 17 or 18 and Exhibit B of Plaintiff's brief, do not show a grill with seven vertical slats in between the head lights.

Plaintiff has not carried its initial burden by clear and convincing evidence that Defendant or its officers, used, displayed or incorporated Plaintiff's HUMMER® and HUMMER GRILL® marks.  Defendant has not violated the Final Judgment and Permanent Injunction as to Plaintiff's HUMMER® and HUMMER GRILL® marks.

### 5.    HUMMER Trade Dress

#### a.    Confusingly Similar

To recover for trade-dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. §

8

1125(a), a party must first identify what particular elements or attributes comprise the protectable trade dress. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 634 (6th Cir.2002) ("[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list.") (internal quotation marks and citation omitted).  Then, a party must show the following: that its trade dress has obtained "secondary meaning" in the marketplace; 2) that the trade dress of the two competing products is confusingly similar; and 3) that the appropriate features of the trade dress are primarily nonfunctional.  *Id., see, Esercizio v. Roberts,* 944 F.2d 1235, 1238 (6th Cir. 1991).*Marketing Displays, Inc. v. Traffix Devices, Inc.,* 200 F.3d 929, 936 (6th Cir. 1999)(rev'd on its finding on the nonfunctional issue by *Traffix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 34-35 (2001); affirming the district court's judgment granting summary judgment finding no infringement of trade dress, *see,* 2001 WL 630049 (6th Cir. May 31, 2001)).  To show "secondary meaning," seven factors are applied: 1) direct consumer testimony; 2) consumer surveys; 3) exclusivity, length, and manner of use; 4) amount and manner of advertising; 5) amount of sales and number of customers; 6) established place in the market; and, 7) proof of intentional copying. *Marketing Displays,* 200 F.3d at 937, *citing, Sassafras Enters., Inc. v. Roshco, Inc.,* 915 F.Supp. 1, 7 (N.D. Ill. 1996).  The *Frisch's* factors are used to analyze whether the trade dress of the competing products is confusingly similar.  *Marketing Displays,* 200 F.3d at 937.  In order to show likelihood of confusion, a plaintiff must establish: 1) strength of plaintiff's mark; 2) relatedness of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) degree of purchaser care; 7) defendant's intent in selecting the mark; and 8) the likelihood of expansion in selecting the mark.  *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 648 (6th Cir. 1982).

9

As to whether a trade dress is functional, if a trade dress is essential to the use or purpose of the article or if it affects the cost or quality of the article, then that trade dress feature is functional and is not allowed trade dress protection. *Traffix Devices,* 532 U.S. at 33. The person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional. *Id.* at 28 (citing 15 U.S.C. § 1125(a)(3))(the same factors are considered under section 1125(a) as are considered under section 1114). The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 280 (6th Cir.1997).

The issue in this case is not whether Defendant infringed Plaintiff's HUMMER trade dress but whether Defendant violated the Final Judgment and Permanent Injunction. In order to prove contempt, a party attempting to establish that a contemnor has violated a judgment is not required to muster all of the evidence it would need to make out an original infringement case, such as establishing all of the likelihood of confusion factors. *See, e.g., Wofard Glassblowing Co. v. Vanbragt,* 118 F.3d 1320, 1322-23 (9th Cir. 1997). A trial court may properly determine by visual comparison of the products whether an alleged product is "confusingly similar" to the protected trade dress, and, therefore, violates the injunction. *Id.* at 1323.

Although Plaintiff need not prove all the factors involved to determine whether Defendant should be held in contempt, Plaintiff must still submit convincing evidence that shows Defendant violated a definite and specific order of the court requiring the party to perform or refrain from performing a particular act or acts with knowledge of the court's order. *Electrical Workers,* 340 F.3d at 379.

The Final Judgment and Permanent Injunction enjoins Defendant and its officers from

manufacturing, advertising and/or selling golf carts that use, display, incorporate or embody the distinctive trade dress and shape or use any "confusingly similar" shape or trade dress of GM's HUMMER® vehicles.  (Final Judgment and Permanent Injunction, p. 5) The Final Judgment and Permanent Injunction defines the HUMMER trade dress "including the inherently distinctive and non-functional shape"[2] and the "distinctive nose and grill" of the HUMMER H1 and H2 vehicles. *Id.* at p. 2.

Plaintiff's evidence consists of photographs of its HUMMER vehicles on page 9 of its brief and photographs of the golf carts found on the www.hotcarts.com website on pages 17, 18 and Exhibit B of Plaintiff's brief.  Comparing the pictures submitted by Plaintiff, the Court finds that the golf carts depicted on the Hot Carts' website are similar to Plaintiff's HUMMER vehicles as depicted on page 9 of Plaintiff's motion.   Plaintiff also submitted one letter from a golf publication requesting a copy of the HUMMER X4 or X6 golf cart.

The HUMMER picture submitted by Plaintiff shows a black rectangular shaped vehicle.  The X4 and X6 golf carts are yellow, red, white, gray, or mixed-colored rectangular shaped.  The HUMMER H1 and HUMMER H2 pictures are in red and yellow.  The HUMMER H1 and HUMMER H2's nose appears to be sloped slightly down with the grill containing seven slats.  The X4 and X6 golf carts on the Hot Carts website do not show that the nose is sloped downwards and the grill does not contain seven slats.  However, both the HUMMER H1 and HUMMER H2 and the golf carts are all rectangular in shape.  Based on the pictures submitted by Plaintiff, Plaintiff has met

---

[2] The Court notes that the parties agreed in the Final Judgment and Permanent Injunction that the HUMMER shape is distinctive and non-functional and, therefore, is a protected trade dress. The Supreme Court has noted that a feature is functional if it is essential to the design or it affects the article's price or quality. *Traffix Devices, Inc.,* 532 U.S. at 33; *ECO Manuf., LLC v. Honeywell Int'l, Inc.,* 357 F.3d 649, 655 (2004).

his burden that the X4 and X6 golf carts are confusingly similar to Plaintiff's trade dress in the HUMMER, HUMMER H1 and H2.

Defendant submitted the affidavit of Ms. Alisha Miller indicating she and the designers specifically designed new golf carts to avoid infringing Plaintiff's trademarks and to avoid a design similar to the "Humdinger"–the old golf cart which Plaintiff claimed infringed its HUMMER trademarks and trade dress.  However, the old golf cart is no longer at issue since Defendant claims, and Plaintiff does not disagree, those golf carts and the molds to the golf carts were destroyed after the entry of the Injunction as required by the Injunction.  The issue in this contempt proceeding is not whether the new golf cart is confusingly similar to the Humdinger but whether the new golf cart is confusingly similar to Plaintiff's HUMMER trade dress.  In any event, intent or wilfulness is not a necessary element of civil contempt.  *TWM Mfg.,* 722 F.2d at 1273.

Defendant also submitted the affidavit of Mr. Chuck Berry comparing element by element the HUMMER H-1 and H-2 to the golf carts.  Because we are not in the context of an initial infringement action, the Court is not required to find every element of an infringement claim in order to conclude that Defendant violated the Permanent Injunction.  *See, Wofard,* 118 F.3d at 1323.  A product need not look exactly like the protected product nor be an exact copy of the trade dress in order to confuse customers.  *Id.*

### b.    Officers/Employees

The Final Judgment and Permanent Injunction states that "Ultra and its owners, shareholders, officers, directors, employees, and successors, and all persons acting in concert or in participation with any of them," are enjoined from manufacturing, advertising and/or selling golf carts or other vehicles that use and embody the distinctive trade dress and shape of Plaintiff's HUMMER vehicles.

12

(Final Judgment and Permanent Injunction, p. 5)  Plaintiff claims that the individuals Alisha Miller, Chuck Berry and Defendant Ultra's counsel, Andrew Couch, should be held in contempt as officers or employees or agents of Defendant Ultra.

Defendant Ultra submitted the affidavit of Alisha Miller indicating that she was the officer of Defendant Ultra and that she signed the Injunction and Settlement Agreement on behalf of Defendant Ultra.  (Miller Aff., ¶¶ 3, 4) At the time the documents were signed, Ms. Miller was the sole officer of Defendant Ultra.  (Miller Aff., ¶ 5) Ms. Miller claims that Plaintiff's lawsuit essentially put an end to the business that Defendant Ultra was conducting and that Defendant Ultra stopped conducting business after the Injunction.  (Miller Aff., ¶ 6) Ms. Miller further claims that any future golf cart business would be conducted through a different company, Hot Carts, Inc., because Defendant Ultra's reputation had been hurt because of the lawsuit.  (Miller Aff., ¶ 6) Ms. Miller had established Hot Carts, Inc. in 2000.  (Miller Aff., ¶ 6)

Ms. Miller claims Chuck Berry has never been an officer or director of Defendant Ultra. (Miller Aff., ¶ 3) Mr. Berry was Defendant Ultra's general manager until 2001 and since that time, has not been employed by Defendant Ultra in any capacity.  (Miller Aff., ¶ 3) Ms. Miller states Mr. Berry assisted in the design of the work of the golf carts made by Hot Carts and has financed the Hot Carts business.  (Miller Aff., ¶ 9)  Mr. Berry submitted an affidavit indicating he was the general manager for Defendant Ultra until early 2001, and, thereafter, was not employed by Defendant Ultra. (Berry Aff., ¶ 2) Mr. Berry claims he has never been an officer or director of Defendant Ultra. (Berry Aff., ¶ 2)

Plaintiff claims Andrew Couch is the registered agent for Defendant Hot Courts and is counsel for both Ultra and Defendant Hot Carts, and, upon information and belief, he has advised

13

the contemnors to violate and circumvent the Permanent Injunction.  Other than upon "information and belief," Plaintiff has not shown Mr. Couch is in fact counsel for Defendant Ultra.  Exhibit J to Plaintiff's motion indicates that the e-mail regarding the HUMMER trade dress issue was sent by Ron Hodges.

Based on the express language of the Final Judgment and Permanent Injunction, Ms. Miller, by her own admission, as an officer of Defendant Ultra and the person who signed the Permanent Injunction on behalf of Defendant Ultra, is subject to any contempt proceedings.  As noted by the Sixth Circuit in *Electrical Workers*, once the plaintiff showed that the company did not comply with the court's judgment and presented evidence that the corporate officer admitted he knew of the court's order yet failed to observe it, the company had met its initial burden for a contempt finding against the corporate officer.  *Electrical Workers,* 340 F.3d at 382.  Ms. Miller had notice of the Injunction by her admission that she signed the Injunction.

Plaintiff, however, has not met its initial burden to show that Mr. Berry or Mr. Couch were officers, directors, employees and successors of Defendant Ultra.  Although Mr. Berry and Mr. Couch could be considered as "persons acting in concert or in participation with any of the officers" as noted in the Final Judgment and Permanent Injunction, Plaintiff has not shown that they had actual notice, by personal service or otherwise, of the Permanent Injunction.  *Id.,* 340 F.3d at 382 n. 11.  In any event, as to contempt proceedings, Plaintiff has not submitted any case law which has held non-party individuals, other than officers, owners or trustees of the company, subject to a contempt proceeding.  Plaintiff has not met its initial burden that Mr. Berry or Mr. Couch are subject to any contempt orders issued by this Court.

14

### c.       Ability to Comply with Order

Since Plaintiff has established a *prima facie* case of contempt against Defendant Ultra and Ms. Miller as to the HUMMER vehicles trade dress claim, the burden shifts to Defendant Ultra and Ms. Miller to produce evidence to show she is presently unable to comply with the court's order. *Id.* at 382.   Ms. Miller provided no evidence to show that she is unable to comply with the Injunction.  The Court notes that Ms. Miller's affidavit indicates all of the Humdinger molds were destroyed and no Humdinger golf carts were produced or sold after Defendant Ultra entered into the Settlement Agreement with GM in this case.  (Miller Aff., ¶ 5) Plaintiff has not submitted any evidence to the contrary.  Although she has not indicated she is presently unable to comply with the Injunction entered by the Court, Ms. Miller has shown that she took reasonable steps to comply with the court's order by destroying the Humdinger molds, which the Court may take into consideration in determining contempt.  However, Ms. Miller's redesign of the golf carts so that the carts did not look like the Humdinger misses the point of the trade dress injunction.  The injunction was to enjoin Defendant Ultra from infringing Plaintiff's HUMMER trade dress, not to manufacture a golf cart which does not copy the Humdinger golf cart.  The Court finds Defendant Ultra, and its officer, Ms. Miller, in contempt of the Court's Final Judgment and Permanent Injunction as to the HUMMER vehicles trade dress claim only.

### d.       Sanctions

Plaintiff seeks an order requiring the contemnors to turn over to Plaintiff for destruction all golf carts and other products in Defendant's possession knocking off any General Motor vehicles, including the HUMMER and Cadillac ESCALADE vehicles, requiring contemnors to account for all sales of the golf carts, award Plaintiff treble damages, award Plaintiff attorney fees and costs, in

connection with this motion, and require contemnors to pay $100,000 in coercive sanctions.

The Court will award sanctions in favor of Plaintiff in this case. The Court will not award destruction of the HUMMER vehicles since the new case filed by Plaintiff relates to those vehicles as well. An accounting will not be awarded in this case, at this time, given the new case filed by Plaintiff against Ms. Miller and Hot Carts. An accounting in the new case, if successful, would cover any accounting requirement in this case. The Court will not award treble damages since the instant motion for contempt is not an infringement action. The Court will also not require the contemnors to pay $100,000 in coercive sanctions since that amount is not supported by Plaintiff. The Court will award actual compensatory damages to Plaintiff. However, Plaintiff has not submitted any evidence as to the amount of compensatory damages it should be awarded. The Court, therefore, awards Plaintiff $16,000.00 in compensatory damages, which is the price of one X4 golf cart shown on the Hot Carts website for Defendant Ultra and Ms. Miller's violation of the Final Judgment and Permanent Injunction Order. (See, Ex. B, Plaintiff's Brief)

The Court also awards reasonable attorney fees and costs relating to the filing of the instant motion. The Court is aware that Plaintiff also filed a new cause of action along with the instant motion. Plaintiff should be mindful in its submission of its attorney fees and costs that the time and amount submitted should reflect the difference between the new action and the instant motion.

Defendant Ultra and Ms. Miller are enjoined from marketing, manufacturing and selling the X4 and X6 Hot Carts golf carts forthwith. A one-thousand dollars ($1,000.00) fine per day, payable to Plaintiff, will be assessed if Defendant Ultra and Ms. Miller do not comply with this Court's Order within ten days from the entry of this Order.

**III.     CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that Plaintiff's Motion to Have Ultra Golf Carts, Inc. and its Officers, Alisha Miller and Chuck Berry and Counsel Held in Contempt of this Court's Final Judgment and Permanent Injunction (**Docket No. 6, filed August 3, 2004**) is GRANTED IN PART and DENIED IN PART, as more fully set forth above.

IT IS FURTHER ORDERED that $16,000.00 in compensatory damages is awarded in favor of Plaintiff and against Defendant Ultra and Ms. Miller.  Plaintiff is awarded reasonable attorney fees and costs relating to the filing of the instant motion, as specifically noted above.  Plaintiff must submit its supporting documents and affidavit on the reasonable attorney fees and costs matter within ten days from the entry of this Order.

IT IS FURTHER ORDERED that Defendant Ultra and Ms. Miller are enjoined from marketing, manufacturing and selling the X4 and X6 Hot Carts golf carts forthwith.  A $1,000 fine per day, payable to Plaintiff, will be assessed if Defendant Ultra and Ms. Miller do not comply with this Court's Order within ten days from the entry of this Order.  Plaintiff will submit an affidavit to support the $1,000 per day fine.

 /s/ DENISE PAGE HOOD_____
DENISE PAGE HOOD
United States District Judge

DATED: May 13, 2005

17